**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF WEST VIRGINIA**
**AT CHARLESTON**

**CANDINA DANIELS,**

**Plaintiff**

**v. Civil Action No. 2:10-0539**

**ANTONIO RUSSELL and**
**OXFORD HOUSE, INC.,**
**a Maryland Corporation, and**
**JOHN DOE, unknown person**
**or persons,**

**Defendants**

**CORSIA RAMEY,**

**Plaintiff**

**v. Civil Action No. 2:10-0540**

**ANTONIO RUSSELL and**
**OXFORD HOUSE, INC.,**
**a Maryland Corporation, and**
**JOHN DOE, unknown person**
**or persons,**

**Defendants**

**KIMBERLY SKEENS**

**Plaintiff**

**v. Civil Action No. 2:10-0541**

**ANTONIO RUSSELL and**
**OXFORD HOUSE, INC.,**
**a Maryland Corporation, and**
**JOHN DOE, unknown person**
**or persons,**

**Defendants**

**BARBARA WINKLER**

**Plaintiff**

**v. Civil Action No. 2:10-0542**

**ANTONIO RUSSELL and OXFORD HOUSE, INC., a Maryland Corporation, and JOHN DOE, unknown person or persons,**

**Defendants**

**MEMORANDUM OPINION AND ORDER**

Pending are the motions by defendant Oxford House, Inc. ("Oxford House"), for summary judgment, filed February 22, 2011, and to strike Exhibits A through E attached to plaintiffs' summary judgment response, filed March 16, 2011.

Respecting the motion to strike, Oxford House asserts that the referenced exhibits are inadmissible for a number of reasons. Inasmuch as the court does not expect to rely upon the challenged documents in adjudicating the dispositive motion, it is ORDERED that the motion to strike be, and it hereby is, denied as moot.

I.

Plaintiffs Candina Daniels, Corsia Ramey, and Kimberly Skeens are West Virginia residents. Defendant Antonio Russell's

citizenship appears to be unknown at this time. It does not appear that he has been served with process. Oxford House is a Delaware corporation with its principal place of business in Maryland.

The Oxford House concept appears to be a novel one. It is explained in the affidavit of Kathleen Gibson, its Chief Operating Officer:

> Oxford House, Inc. is a . . . not for profit corporation . . . . Oxford House is a network of approximately 1400 houses nationwide that provides housing for recovering alcoholics and drug addicts. . . . Each Oxford House is democratically run, financially self-supporting, and expels any resident who resumes the use of drugs and alcohol while residing in an Oxford House. . . . Oxford Houses are not residential treatment facilities and there is no staff residing at an Oxford House or in charge of operating an Oxford House. . . . Each Oxford House is self-run, meaning that the residents are in charge of running the house and making all the decisions pertaining to each Oxford House on a democratic basis. . . .
>
> Oxford House employs persons to open and establish Oxford Houses in various states. It hires residents or former residents of Oxford Houses. The prospective employee must have been a resident of an Oxford House and must have lived in an Oxford House without incident. This means that the individual must not have been asked to leave an Oxford House because of resumed alcohol or drug use, or failure to pay rent, or for engaging in disruptive behavior.

(Aff. of Kathleen Gibson ¶¶ 2-3).

In 2005, Russell was hired by Oxford House as an outreach worker in North Carolina. Kathleen Gibson was the

Oxford House state coordinator for North Carolina at the time. Russell filled a vacancy created after Ms. Gibson terminated an outreach worker for having a relationship with a female Oxford House resident. Ms. Gibson asked Russell if he had ever had an inappropriate relationship with a female either before or after he was himself an Oxford House resident. He assured her to the contrary. Ms. Gibson hired him based upon:

> an outstanding record of being active with the Winston-Salem, North Carolina chapter of Oxford Houses as well as his activity in assisting Oxford House on a state level. He also had excellent credentials as a result of his work on a special project for the North Carolina Department of Vocational Rehabilitation.

(Id. ¶ 4). She did not conduct a criminal background investigation on Russell.

In 2007, Oxford House was awarded a contract by West Virginia to seed its homes in the state. Russell was reassigned to that task, with primary responsibility to open houses in the Charleston, Huntington, and Parkersburg areas. He achieved some success. For example, in June 2007 he opened an Oxford House located in Dunbar ("Oxford House Dunbar"). Oxford House Dunbar was restricted to female residents only.

Daniels, a parolee at the time, resided at Oxford House Dunbar for six days in July 2008. Skeens stayed there from April

to May 2008. She was asked to leave after she wrote an unauthorized check from the house account. Ramey arrived in January 2008 and left the next month. Oxford House asserts that she was "continually behind in her rent, and left the house without notice, and with her rent in arrears." (Id. ¶ 6).

Oxford House maintains a "a strict written policy against sexual harassment and sexual misconduct among its employees." (Id. ¶ 9). Ms. Gibson recounts one provision of the policy providing, inter alia, as follows: "The practice of [employee] involvement with members of Oxford Houses for sexual contact is discouraged especially where Oxford House members possess less than one year of sobriety." (Id.)

While the meeting minutes of Oxford House Dunbar reflect no contemporaneous complaints by Daniels, Skeens, or Ramey about Russell, plaintiffs now allege disturbing versions of abuse and harassment inflicted upon them by him during their respective stays. Daniels' account is as follows:

> Russell sexually abused and sexually harassed females while they were housed at the Dunbar House. During the latter part of July, 2008, Defendant Russell, upon meeting me for the first time at the Men's Center, he immediately gave me a hug, kissed my check and told me I was cute. Later this day, Defendant Russell telephoned the Oxford House and started talking to me in a sexual manner. The second incident happened in my bedroom. He had called early to see if anyone was home.

> **Defendant Russell came in, sat on my bed and began fondling me and uttering sexually, vulgar words to me. Defendant Russell then asked me when we were going to "hook up" in a sexual manner. The last incident occurred when I was in the shower when I heard someone call my name out as I pulled the curtain back I saw Russell standing in the bathroom, holding his erect penis in his hand, talking to me in an inappropriate sexual manner. I left the Oxford House that night.**

**(Pls.' Ex. G. at 3). She adds that "The sexual harassment and sexual abuse . . . made me fearful to stay at the Oxford House. I chose to leave to escape . . . Russell's abuse." (Id. at 7). She also states in her affidavit the effects she experienced as a result of Russell's actions: "Since the sexually [sic] harassment and sexual abuse . . . , I experience anxiety, insomnia, depression, troubles with relationships and a fear of men." (Aff. of Candina Daniels ¶ 3).**

**Ms. Ramey offers a similar version of events respecting Russell's actions:**

> **Russell sexually abused and sexually harassed females while they were housed at the Dunbar House. He didn't telephone me at . . . [Oxford] House. Russell sexual[ly] harassed me while I was alone in the house. Russell followed me down to the laundry room and grabbed my buttocks and pushed me against the washer and said "you have a nice ass." I could feel his erect penis against my back. In the downstairs bedroom where I was staying, I had locked the door to take a shower. Russell had somehow entered my bedroom and came into the bathroom where I was showering. As I looked out of the shower to see what was making the noise in my room, Russell was walking towards me with his penis erect masturbating and making sexual comments and sexual**

> advancements. I screamed and he ran out of the room. On another occasion, Russell entered my room when I was lying on my bed. He approached me making sexual remarks and fondled my body.
>
> . . . .
>
> He also requested me and another girl to have sex with him.

(Id. at 12, 14). Ms. Ramey at first was afraid to report the incident but later informed her parole officer, Justin Gibson. Ms. Ramey also noted how Russell's actions have affected her: "Since the sexually [sic] harassment and sexual abuse of Defendant Russell, I experience anxiety and depression." (Aff. of Corsia Ramey ¶ 3).

Ms. Skeens' account is similar. She accuses Russell as follows:

> Antonio Russell sexually abused and sexually harassed females while they were housed at the . . . [Oxford] House. Our first meeting was when Russell was transporting me to the Dunbar House. On the drive he continuously rubbed my leg and asked me for a date. He asked me out on a date on several different occasions. Russell fondled my body on more than once and tried to kiss me. One incident occurred in the kitchen of the Dunbar House as I was preparing food. Russell pushed me into the food pantry and began groping and kissing me. He would often do this in front on [sic] my son. The last incident occurred in a pharmacy parking lot when Defendant Russell approached me and said, "You didn't give me a hug before you left." He then hugged me and began fondling my breasts.

(Id. at 21). Ms. Skeens explained that she "had no way to keep . . . [her] son with . . . [her] unless . . . [she] allowed Russell

to harass and abuse" her. (Id. at 24). In her affidavit, she addresses the effects of Russell's actions upon her:

> When I think about being around Antonio Russell I get nervous and sad. I try and block him out of my memory. I have more trust issues with men than I used to. When Antonio Russell tried to put me in the corner in the kitchen and touch me, it brought back bad memories of something that happened to me when I was 14.

(Aff. of Kimberly Skeens ¶ 4).

Prior to his employment with Oxford House, Russell had attracted the attention of law enforcement on multiple occasions. In addition to various traffic and registration offenses, plaintiffs' Exhibit F, accompanying their response to Oxford House's dispositive motion, includes the following information about Russell's criminal history:

| Charge Date | Offense | Disposition |
| --- | --- | --- |
| 4-27-1986 | Driving while impaired | Pled guilty |
| 3-11-1989 | Driving while impaired | Pled guilty |
| 3-11-1989 | Felony marijuana possession | Dismissed |
| 5-20-1993 | Intoxicated and disruptive | Pled guilty |
| 1-30-1997 | Assault on a female | Pled guilty |

(Pls.' Ex. F).

Counsel for Oxford House states Russell's criminal history "would not have impeded . . . [his] hiring as nearly 80%

of Oxford House members . . . have some sort of criminal history." (Def.'s Mem. in Supp. at 6). It is further observed that the 1997 domestic battery conviction in particular "would not, in any case, have been seen as a red flag." (Id.)

In the spring of 2009, Oxford House undertook an investigation of Russell based upon job performance complaints about him from other Oxford Houses. He was terminated in June 2009. The deficiencies that led to his termination included (1) a failure to send reports as directed, (2) allowing houses to write insufficient funds checks, and (3) a failure to install telephone service at another Oxford House facility for an extended period. The regional supervisor charged with the investigation, John Fox, was never informed about any inappropriate behavior with female residents. Oxford House contends such allegations played no role in Russell's termination.

On December 9, 2009, Daniels, Ramey, and Skeens instituted separate actions in the Circuit Court of Kanawha County against Russell and Oxford House. On April 21, 2010, Oxford House removed. On July 28, 2010, plaintiffs filed amended complaints. The pleadings are a bit confusing. The first three counts are straightforward, alleging (1) intentional infliction

of emotional distress ("Count One"), (2) invasion of privacy ("Count Two"), and (3) what appears to be negligent hiring, retention, supervision, and training ("Count Three").

The remainder of the pleadings then veer off. Count Four appears to allege only satisfaction of the standard governing an award of punitive damages. The court does not understand Count Four to qualify as a separate claim.

Count Five offers a litany of claims, which include the causes of action pled in Counts One through Three and, additionally, other claims such as "Violation of the West Virginia Human Rights Act" and "Law of Agency," along with legal theories not constituting separate claims, such as "Doctrine of Respondent [sic] Superior." Count Six appears to list only general damage elements. Count Seven appears duplicative of Counts One through Three. The court does not understand either Counts Six or Seven to constitute stand-alone claims.

On August 12, 2010, the court consolidated these actions for purposes of pretrial development and conferencing. It reserved at that time the question of consolidating the cases for trial. On February 22, 2011, Oxford House moved for summary judgment. First, Oxford House asserts that it is not vicariously

liable for the intentional torts committed by Russell. Second, it contends that it is entitled to summary judgment respecting that portion of Count Three alleging negligent hiring, retention, and supervision of Russell by Oxford House.

II.

A. Governing Standard

A party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). Material facts are those necessary to establish the elements of a party's cause of action. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).

A genuine issue of material fact exists if, in viewing the record and all reasonable inferences drawn therefrom in a light most favorable to the non-moving party, a reasonable fact-finder could return a verdict for the non-movant. Id. The moving party has the burden of showing -- "that is, pointing out to the district court -- that there is an absence of evidence to support

the nonmoving party's case." Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986). If the movant satisfies this burden, then the non-movant must set forth specific facts as would be admissible in evidence that demonstrate the existence of a genuine issue of fact for trial. Fed. R. Civ. P. 56(c); id. at 322-23. A party is entitled to summary judgment if the record as a whole could not lead a rational trier of fact to find in favor of the non-movant. Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

Conversely, summary judgment is inappropriate if the evidence is sufficient for a reasonable fact-finder to return a verdict in favor of the non-moving party. Anderson, 477 U.S. at 248. Even if there is no dispute as to the evidentiary facts, summary judgment is also not appropriate where the ultimate factual conclusions to be drawn are in dispute. Overstreet v. Ky. Cent. Life Ins. Co., 950 F.2d 931, 937 (4th Cir. 1991).

A court must neither resolve disputed facts nor weigh the evidence, Russell v. Microdyne Corp., 65 F.3d 1229, 1239 (4th Cir. 1995), nor make determinations of credibility. Sosebee v. Murphy, 797 F.2d 179, 182 (4th Cir. 1986). Rather, the party opposing the motion is entitled to have his or her version of the facts accepted as true and, moreover, to have all internal conflicts resolved in his or her favor. Charbonnages de France v. Smith, 597 F.2d 406, 414 (4th Cir. 1979). Inferences that are

"drawn from the underlying facts . . . must be viewed in the light most favorable to the party opposing the motion." United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

B. Oxford House's Vicarious Liability for Russell's Intentional Torts

In Musgrove v. Hickory Inn, Inc., 168 W. Va. 65, 65, 281 S.E.2d 499, 500 (1981), the Supreme Court of Appeals of West Virginia observed as follows:

> An agent or employee can be held personally liable for his own torts against third parties and this personal liability is independent of his agency or employee relationship. Of course, if he is acting within the scope of his employment, then his principal or employer may also be held liable.

Id. at 65, 281 S.E.2d at 500. Subsequent decisions by the supreme court of appeals elaborate on the rule stated in Musgrove.

In Barath v. Performance Trucking Co., Inc., 188 W. Va. 367, 368, 424 S.E.2d 602, 603 (1992), plaintiff Barath was attacked by David Cook Jr., who may have been an employee of defendant Performance Trucking Company, Inc. ("Performance Trucking"). Cook's father, David Cook, Sr., was employed as manager by Performance Trucking. Just prior to the attack, a

witness heard the son state that his father had told him to attack Barath the next time he encountered him.

The supreme court of appeals concluded that the witness account, along with the facts that (1) Performance Trucking had been the victim of a labor strike, and (2) that Barath was involved in the strike as a union member, counseled against granting summary judgment:

> While the evidence on this point was exceedingly indirect, this Court believes that it did suggest that union unrest might have caused financial losses to Performance Trucking . . . that David Cook, Sr., as manager of the company, was aware of and felt the losses and had developed animosity toward the appellant, and as a consequence had directed his son to "beat" the appellant. Overall, it is suggested, but certainly not proven, that David Cook, Jr., who might have been an employee of Performance Trucking Co., Inc., at the time of the battery in this case, might have been acting within the scope of his employment at the time of the battery.

Id. at 371, 424 S.E.2d 602, 424 S.E.2d at 606.

In Foodland v. West Virginia Department of Health and Human Resources, 207 W.Va. 392, 532 S.E.2d 661 (2000), a grocery store was penalized by a regulating state agency after a store employee perpetrated a fraud against a welfare benefits program in which the store participated. The employee was fired after the theft and Foodland received no benefit from the fraud.

The supreme court of appeals discussed "scope of employment" as follows:

> "Scope of employment" is a relative term and requires a consideration of surrounding circumstances, including the character of the employment, the nature of the wrongful deed, the time and place of its commission and the purpose of the act.
>
> In general terms, it may be said that an act is within the course of the employment, if: (1) It is something fairly and naturally incident to the business and (2) it is done while the servant was engaged upon the master's business and is done, although mistakenly or ill-advisedly, with a view to further the master's interests, or from some impulse or emotion which naturally grew out of or was incident to the attempt to perform the master's business, and did not arise wholly from some external, independent and personal motive on the part of the servant to do the act upon his own account.

Id. at 397, 532 S.E.2d at 665 (emphasis supplied). This analysis led to the following conclusion:

> Employee theft is certainly not naturally incident to the owner's business and even though the act was done while the cashier was engaged in the owner's business, the theft was not done with a view to further the owner's interests. The theft arose from a personal motive on the part of the cashier to further her own interests. Under these circumstances, the employee's theft from the WIC program simply does not fit within her scope of employment.

Id.

The present action bears a much stronger resemblance to Foodland than Barath. Unlike the situation in Barath, Russell's acts lack even the most minimal connection to Oxford House's

business. Oxford House's policies condemn sexual misconduct by employees. That type of misconduct is certainly not naturally incident to Oxford House's mission. It is immaterial that Russell may have perpetrated some of his misdeeds during work hours. His misconduct was not performed with any intention to further Oxford House's interests.

Inasmuch as Russell's actions were motivated by a personal desire on his part to abuse and harass the female residents of Oxford House Dunbar, they do not fall within the scope of his employment. The court, accordingly, ORDERS that Oxford House's motion for summary judgment be, and it hereby is, granted insofar as it seeks a determination as a matter of law that Oxford House is not vicariously liable for the intentional torts perpetrated upon plaintiffs by Russell of which it has not been shown to have been aware until after all three plaintiffs had left Oxford House Dunbar.

C. Oxford House's Liability for Negligent Hiring, Retention, and Supervision

The supreme court of appeals has recognized a claim for negligent hiring, which may or may not equate with negligent retention. See, e.g., McCormick v. West Virginia Dept. of Public

Safety, 202 W. Va. 189, 193, 503 S.E.2d 502, 506 (1998) ("There can be no doubt that this court has recognized a cause of action based upon a claim of negligent hiring (or negligent retention) . . . .") (citing State ex rel. West Virginia State Police v. Taylor, 201 W. Va. 554, 560 n. 7, 499 S.E.2d 283, 289 n. 7 (1997)). The decision in McCormick further observed as follows:

> [A] fair formulation of the inquiry upon which liability for negligent hiring or retention should be determined is: "when the employee was hired or retained, did the employer conduct a reasonable investigation into the employee's background vis a vis the job for which the employee was hired and the possible risk of harm or injury to co-workers or third parties that could result from the conduct of an unfit employee? Should the employer have reasonably foreseen the risk caused by hiring or retaining an unfit person?"
>
> . . . .
>
> [A] primary question in determining whether an employer may be held liable, based on a theory of negligent hiring or retention, is the nature of the employee's job assignment, duties and responsibilities -- with the employer's duty with respect to hiring or retaining an employee increasing, as the risks to third persons associated with a particular job increase.

Id. at 193, 503 S.E.2d at 506. It was also noted in McCormick as follows: "The obtaining of criminal history record information has been an issue in a number of negligent hiring and retention cases." Id. at 193 n.5, 503 S.E.2d at 506 n.5.

Oxford House did not conduct a preemployment investigation of Russell. That inquiry would have revealed Russell was previously convicted of assaulting a female. It would also have revealed what plaintiffs characterize as "a chronic disregard for authority." (Pls.' Resp. at 11). These considerations give rise to a genuine issue of material fact respecting negligent hiring.

The jury might ultimately find that hiring Russell did not amount to negligence despite his prior criminal history. Another genuine issue of material fact would then arise, however, respecting the negligent supervision and retention claims. The jury would be entitled to consider whether the criminal history might have at least triggered an obligation on Oxford House's part to more closely surveil Russell over the long term, which might in turn have revealed his misconduct earlier or perhaps prevented it had he known he was the subject of ongoing close scrutiny.

For these reasons, the court concludes that Oxford House is not entitled to judgment as a matter of law on plaintiffs' claims for negligent hiring, supervision, and retention. The court, accordingly, ORDERS that Oxford House's

motion for summary judgment as to these claims be, and it hereby is, denied.[1]

III.

Based upon the foregoing discussion, it is ORDERED that Oxford House's motion for summary judgment be, and it hereby is, granted to the extent that it seeks a determination as a matter of law that Oxford House is not vicariously liable for the intentional torts perpetrated upon plaintiffs by Russell and denied in all other respects.[2]

---

[1]Plaintiffs' response discusses their claims under the West Virginia Human Rights Act. Oxford House did not move for summary judgment on those claims. It devotes a single page to the matter in its reply brief. The court concludes the discussion found therein is an insufficient basis for judgment as a matter of law at this time.

Oxford House also briefly asserts that it is entitled to summary judgment on the question of damages. Inasmuch as that matter is reserved to the fact finder, and that genuine issues of material fact remain on the matter, the court concludes that Oxford House is not entitled to judgment as a matter of law on the issue.

[2]The court notes that Barbara Winkler, plaintiff in the third member action, is proceeding pro se. This follows her counsel being permitted to withdraw as a result of her refusal to assist them in prosecuting this action and her failure to retain new counsel by the April 14, 2011, deadline imposed by the court.

Ms. Winkler was given until May 5, 2011, to respond to Oxford House's motion for summary judgment. The court need not, however, await that response. Oxford House has received judgment

(continued...)

The Clerk is requested to transmit this written opinion and order to all counsel of record and to Ms. Winkler at the following addresses, by certified mail return receipt requested:

P.O. Box 43 1105<br>Alum Creek, WV 25003

9th Street Apt 2<br>Huntington, WV 25701

DATE: May 3, 2011

John T. Copenhaver, Jr.<br>United States District Judge

[2](...continued) as a matter of law respecting only its vicarious liability for Russell's misconduct. For the reasons stated supra, it is unlikely that Ms. Winkler might offer any evidence that Russell's egregious misconduct somehow fell within the scope of his employment. Should that be the case, Ms. Winkler may move for reconsideration to present her evidence concerning that narrow issue. In the event that Ms. Winkler does not appear for the pretrial conference, the court will entertain a motion to dismiss her claims without prejudice pursuant to Federal Rule of Civil Procedure 41(b).